Good morning, Your Honor, and may it please the Court. My name is Eric Tung of Jones Day, representing Michael Thomas. Mr. Thomas broke his hand in prison and the prison doctors did little to treat it. They delayed nine months in giving him a permit to sleep in a lower bunk, despite repeated requests by Mr. Thomas that he needed such a permit. And during that months-long delay, Mr. Thomas had to climb painfully up and down the bunk using his broken hand. Mr. Tung, that time frame that you're referencing there, is that January of 2015 to June of 2015? That's part of it, Your Honor. I'm starting from October 2014, when Mr. Thomas requested a renewal of his low bunk permit. And he made that request of a nurse, who then said that a medical doctor needed to approve it. And that's on page sub-appendix 48, Your Honor. And on the side of that medical chart, you see what looks to be Dr. Obese's signature, indicating his review of it. And yet at that time, no permit was granted. And then on January 2015, Mr. Thomas makes another request, this time more directly, when he sees Dr. Obese. And still no low bunk permit was issued at that time. What I'd like to focus Mr. Tung in on is, any record evidence that you've identified that Mr. Thomas' injury to his hand was exacerbated by the delay, or that pain was unnecessarily prolonged, whether it be the nine-month period or the six-month period, could you point us to any record evidence of that type? Yes, Your Honor. So he, Mr. Thomas, has consistently been complaining of his hand pain, and that's in sub-appendix 101. And he complains about it in October 2014, hence his request for a low bunk permit. That's in sub-appendix 48. And in January 2015, he complains about the pain too. And so we would argue, Your Honor, that during that time, his pain was prolonged for a period of eight months until he received the low bunk permit in June of 2015. But how do we know that? Is that an inference that you're asking us to make, that the pain continued during that time frame? I'm trying to discern whether or not, if we're in a medical delay situation, what impact or consequence that delay may have had for Mr. Thomas. You're right, Your Honor. That is a reasonable inference that a jury could make in the light viewed most favorably to Mr. Thomas. The fact that he had asked for the low bunk permit multiple times and was denied it, and also the fact that he complained of his pain, which was a serious medical condition that opposing counsel does not dispute. Can I ask you to look at this? It's actually a very similar, maybe related question, from a slightly different point of view. We have a lot of medical records in this case, and they flop back and forth. So there'll be a record that will say, looks like the hand is now healed. Maybe there's some foreshortening, but it's healed. And then six or nine or months later or a year later, there's another record that says, well, actually, no, it's not resolved. There's a re-demonstration of the injury, or it's not resolved. So I want to know whether you're asking us to draw an inference from these seemingly conflicting medical records that maybe it never was completely resolved. It might have seemed resolved on an x-ray, but then a new x-ray comes along. And at a minimum, whether that's a question of fact that requires exploration. Your Honor, thank you. At a minimum, that does present a disputed question of fact that should not have been resolved by the trial court. And you're right to point out that there are medical records that in some places say that there was some healing that took place and that there was a re-demonstration, particularly in September 2016, and that the fracture completely healed. So to tie it to Judge Brennan's point, if we're looking for evidence in the record that this delay in treatment actually had a negative medical aspect to it, i.e. the hand doesn't heal, I wonder if this is enough evidence to meet that burden for you. It certainly is, Your Honor. It certainly is. And we have, I would point, Your Honor, to SUP Appendix 115 and 110, and also the EMG report in SUP Appendix 109, which discusses not only the fractures not having been healed properly, but also the abnormal results from the EMG testing, which indicated some form of nerve degeneration. And I think in light of this record, we don't have to prove on summary judgment conclusively that there was permanent nerve damage. We only at this stage are required to raise an inference, a conclusion that the jury could And I think we satisfy that standard here. But I would point out, Your Honors, that as an independent basis for reversal, so long as we can show that Mr. Thomas, from the delays, suffered prolongation of his pain and not just an exacerbation of his hand injury, that itself would provide an independent basis for reversal. And I think we've proved that adequately here. Going back to Judge Brennan's colloquy with you a few moments ago, is there any place in the record where we are told explicitly that during the period when your client did not have a lower bunk pass, he in fact had to use an upper bunk? Your Honor, we have on with Dr. Martija on in sub appendix 56, upon granting a low bunk permit for Mr. Thomas, stated that, quote, Mr. Thomas was unable to climb to the upper bunk due to his right hand problem. So I think that that comes very close, Your Honor, to saying that it proves in our view that he did have to climb up and down the bunk bed without the low bunk permit, and he had to do so with his broken hand. And we can talk about the prostate problem later, but that exacerbated his need to go down the low bunk bed just to urinate. He had frequency urination at night. You would expect, though, that in some place of record, your client would have said, I have to use an upper bunk because I don't have one of these permits. And it's apparently he doesn't say it. Your Honor, he says that he needed a low bunk permit in October 2014. And from that, a jury can draw the very reasonable inference that he, in fact, needed to use the low bunk permit and that he had to, in some cases without the permit, had to climb down and up the bunk bed. I mean, I think that's the best answer you can give Judge Ripple. You're asking for the inference that his descriptions of climbing up and down to the upper bunk imply that a jury could infer from that that he had to be in the upper bunk and that if he'd been in the lower bunk, he wouldn't have been pestering them for a lower bunk permit. I mean, we can clearly think about that, but I think that's where you are. That's right, Your Honor. And I think on questions of credibility, I mean, at trial, a jury could find Mr. Thomas's testimony not credible. But that weighing of the testimony is not done on summary judgment, Your Honor. Again, I stress the standard of review on summary judgment, which is to view the evidence in the light most favorable to Mr. Thomas. And that clearly wasn't perfect. And the reasonable inferences. Reasonable. And the reasonable inferences, Your Honor. That's right. And so the delays here, Your Honors, they not only prolonged Mr. Thomas's pain, as discussed in my discussion with Your Honors, it also exacerbated his broken hand. And there's medical evidence in the record suggesting that his hand had not healed and, in fact, had gotten worse based on a redemonstration of the fractures. But the neglect really did not end there. He also suffered from an enlarged prostate. He had trouble urinating and had frequent urination at night, which disrupted his sleep. And that's called nocturia in the record. And the doctors knew that a particular medication, namely Flomax, had just failed to work. But they prescribed it anyway. But didn't they also prescribe, at least your opponent indicates that there are a number of other drugs that they added to the Flomax over time. And they changed the strength of the Flomax prescription. So they were at least trying, even if they weren't succeeding. Your Honor, they use sporadically different drugs. However, we don't think that under the case law, Petty's versus Carter, where it talks and Greeno and Kelly and Sherrod and all those cases. So that doesn't negate the fact that if the doctors knew that a particular form of treatment, in this case, it was primarily the Flomax, that the doctors knew and effective, yet they continued to prescribe it. And the record also shows in a place that Flomax might have even exacerbated Mr. Thomas's prostate problem. The record said that when he was off Flomax, in appendix page 51, Mr. Thomas, quote, has been off Flomax. And that reduced his nocturia. In other words, being off Flomax reduced the symptoms of having frequent urination at night. And yet afterwards, the doctors continued to prescribe Flomax. So we do think in that situation, a jury could once again draw a reasonable inference that the doctors acted with deliberate indifference with respect to his prostate. And the other issue I wanted to talk about, Your Honors, if I may, just really quickly, is the threshold issue here too. In the court below, Dr. Obese only moved for summary judgment on one ground. And that is that the Dead Man Act precluded summary judgment. Clearly, as a court has held that the Dead Man Act does not apply in a case involving federal law, that's basic civil procedure here. And not surprisingly, opposing counsel does not raise that argument on appeal. In fact, he abandons it. Nor does he dispute that that was the only ground that was raised in the district court. And no further briefing either? Excuse me. No further briefing either, Your Honor. I mean, it was unlike the Costello case where at least the argument was raised in the reply. And yet the court there said still that it was too late to raise a new argument. In response to the motion for summary judgment, however, did you not respond to the merits of the Eighth Amendment argument? Not with respect to Dr. Obese, Your Honor. You sure of that? What did you put in in reply to the summary judgment argument? Well, there was evidence that was put in, arguments regarding Dr. Martija on the merits. But there was general mention of a lack of care and deliberate indifference with respect to Wexford. And did you put in the medical record? Yes, the medical records were all in there, Your Honor. The medical record was put in? Yes, Your Honor. But I think on the basic principles of party presentation, it is the burden on the moving party to raise the grounds on which they are seeking summary judgment. What else do you want to put in? I'm trying to find out if you were at all prejudiced in this matter. What else did you want to put in that you were? Your Honor, I mean, Dr. Obese has since passed away, but potentially his deposition before he had passed, I mean, there were all kinds of things that could have been done. But I think primarily it was Michael Thomas was not given an opportunity to fully present his arguments on the merits. And that violates principles of fair notice and party presentation that the Supreme Court in Sinang v. Smith really, really instructed that courts follow. I see that my time is running low, Your Honor. I'd like to reserve 30 seconds. Just about, okay. Why don't you save what you can. All right. Thank you very much. Mr. Skarpiak. Good morning, Your Honors. Counselor, may it please the Court. My name is Chad Skarpiak. I represent the athletes in this case, which is the state of Dr. Obese, Dr. Martillo, and Wexford. Your Honors, Judge Pallmeyer did a detailed review of the medical record which was presented in this case for summary judgment. And the medical record is what's driving this case because plaintiff decided not to take the deposition of Dr. Obese, who was still alive prior to the close of discovery. He did not take the deposition of Dr. Martillo. He did not take the deposition of any trainers. He did not present any expert opinion witnesses of his own. So can I ask you about these medical records, Mr. Skarpiak, because that's precisely what bothers me about this. I mean, they, as I indicated to Mr. Tong, you can read some of the records and think that the x-rays are being read to indicate that asbestos can be done. You know, these broken hand bones are healed. They're a little foreshortened, but there you are. And then you'll get a later record saying, well, no, it's actually, it's not healed yet. And, you know, I'm not a physician, and it seems to me that one needs to see what the story is. Now, there are reasonable explanations, which is that maybe it was only partly healed, but every time he had to use the hand, say, climbing up and down the upper bunk, you know, it rebroke. Things do rebreak. And I feel as though we've got conflicting evidence in this record about whether the hand ever healed. Your Honor, I appreciate the question, and that's precisely the point here. Neither myself, nor opposing counsel, nor this court put on white coats. We are not physicians. It was plaintiff's burden at the end of the day, though, to demonstrate via admissible evidence that there is a claim to proceed forward in trial with deliberate indifference. Right, and why can't the plaintiff rely on the medical records that show it's not yet healed to show that it's not yet healed? You know, the jury might buy that. Your Honor, respectfully, there was no deposition testimony from the treaters. Plaintiff is asking this court and a jury to review the case on a raw record. With respect to the hand breaking, there is no evidence that the hand was rebroken. Plaintiff's counsel is talking about a re-demonstration on a radiology report, and a re-demonstration just means this is what we saw prior. When we look at the records from Dr. Naja from UIC, there's no declaration from him that there's a re-breaking. In fact, he says it's an old fracture, and the only thing that we can do right now is therapy, which the record has shown that Mr. Thomas, over the course of his time in Stateville, had received three courses of physical therapy, and during the first course, had resolved the problem of physical therapy. The physical therapist said, you're doing well. You've regained your strength, your grip strength, your mobility. We're going to discontinue. But, you know, you're asking us to make a very material assumption with respect to the UIC records, because there's a time when the specialist writes in November, I think this is November of 2015, that the hand had, quote, now, N-O-W, completely healed, but then the next you sort of wave your hand and say, oh, well, that was supposed to be a W. I'm going to sit here and look at the typewriter pad on my laptop. A T is several spots off from W, and I don't know how, on summary judgment, we can just say, oh, it was a typo. I mean, it's also possible that the specialist first is under the impression that it was fully healed, but then later discovers further damage to suggest that it wasn't fully healed. So, Your Honor, you're looking at the November 12, 2015 orthopedic note. I'm sorry, the 2016 orthopedic note. That's one where in your brief, you just say, oh, well, it's a typo. But I'm very uncomfortable with that approach. So, Your Honor, if you look at the corresponding radiological imaging that was taking place in which says, deformity of the heads of the fourth and fifth metacarpal bones, as described, due to old fractures. There's no impression of a new fracture, and that was what Your Honor was saying previously. But let me just pick at this and say, there wasn't a new fracture. The question is whether the old fracture has fully healed. Nobody is saying that he went out on the basketball court and broke his hand again. What we're asking is whether the old fracture had ever fully resolved itself to heal. So, I'm not sure that that radiologist note gets me over the finish line. Your Honor, the report that you're looking at from the specialist is referring to the radiology report in September of 16. And the radiology report in September of 16 does not include any discussion. There's no evidence that there's a new fracture. The only impression is respect to an old fracture. But the report says the hand had not completely healed at 110 supplemental defenses. And so there's a referral for additional occupational therapy, and there's, you know, and the specialist tells him, you know, boy, this wouldn't be still having these problems if your hand had originally been handled correctly. It's just a matter that you're dealing with, and that is of some concern to me because we do have all these other things about how good is the evidence that he's climbing up and down the bunk and why he's climbing up here and so on. But this is a central point. Your Honor, I would respectfully request that you take a look at the context of that presentation. If there was a new fracture, I would reasonably assume that the orthopedist would put him in a cast or a splint or something of that nature. But his report is, there's nothing we can do now, which is suggestive that it is that old healed fracture that we've talked about before where there is a deformity, and at this point, he's just got chronic pain. And that is the reasonable inference that can be construed in this record based upon the totality of what is happening in UIC and how patient is presenting at this table. But is it the only reasonable inference? That would be the issue for summary judgment. It certainly does strike me that it's a reasonable inference, but is it the only one? I believe so, Your Honor. And again, it's plaintiff's burden of proof to demonstrate that there is the material issue of fact in this case. And whether or not there was an issue of fact as prospectively defined in here, and I respectfully submit, given the context of this case, it is a typo. It is a dictation error that there was no rebraking because there's no other evidence anywhere else in the record to suggest that there is a rebrake. If there was a rebrake, we would expect the orthopedist to say, there's a rebrake. I need to cast this. I need to splint this. I need to do something else. But putting him into therapy is ridiculous. So I respectfully submit that that is the only inference that can be developed here. And if plaintiff had an issue with this that he wanted to explore, he had the opportunity to do so in discovery and chose not to. But beyond that point, even in September of 2016, he said, go to therapy, and plaintiff was put into therapy. So with respect to the entire- somebody wrote, the hand had not completely healed, but it shortened and revealed three demonstrations of deformities. You said a little bit about that, but I'm seeing that as, again, inconsistent with the notion that all is well. Your Honor, just so I'm clear, are we looking at the September of 2016? Well, I thought there was an x-ray that was taken in August of 2016. Maybe there's a note a little bit later saying that the hand had not completely healed. So based upon Your Honor's discussion about the re-demonstration, that's seen in a September of 2016 radiology report, which says re-demonstration of the deformity. And re-demonstration of the deformity is re-demonstrated on the x-ray image. The impression is a deformity with old fractures due to preserved joint spaces. But you're not worried about the statement in the note, not completely healed? Based upon the totality of the evidence here, Your Honor, without some sort of explicit declaration from an orthopedist saying there is a break, I am not. And because the orthopedist's plan on this was, we're going to give you therapy. And that's what he did receive. And that's the whole tenor of this case, Your Honor. Judge Pallmeyer did a detailed review of the record and agreed with defendants that the trajectory of care and plaintiff in this case was, looking at a context as a whole, was repeatedly seen by providers providing care through several avenues of relief. But my concern with that statement, he certainly gets treated from time to time, but there are lengthy periods when nothing is happening. Whether it's with a low bunk permit, it will just say the hand is what it is, you know. But we do have a theory under the Eighth Amendment that prolongation of pain when very easy measures, such as a low bunk permit, can be taken. Nobody's talking about an organ transplant, you know. Something very easy is also potentially grounds for a minor liability. So, Your Honor, again, plaintiff has to show that there is some evidence in the record that there was prolonged pain. There was a discussion with plaintiffs. So how can he show that other than by saying so? Pain is subjective. Exactly right, Your Honor. Your Honor, you're exactly right. He can say so. And there is no evidence in here that he has ever added that during the two time periods that we have in place. So it's the, when he first files his grievance in October of 2014, he says, I want my low bunk permit renewed. What he doesn't say is, I'm climbing up to the top bunk. I need to get off the top bunk. I'm having pain because of the top bunk. Is there any reasonable inference other than that, though? Why would you be constantly asking for a low bunk permit if you were sleeping in the low bunk? Your Honor, he could be asking for a low bunk to ensure that he doesn't go up to the top bunk. But just asking for the permit doesn't necessarily mean that he's up on the top bunk. But why would he then add that it's really hurting his hand to have to climb up and down? What's he climbing up and down for? So that specific statement is with Dr. Martillo, which is in a separate occasion after he's received a low bunk permit in June of 2015. That extends to December. And there's a one month period of time between December 15th of 2015 in January when Dr. Martillo sees him in January. And the discussion is his inability to climb up to the top bunk. That is not a discussion that is explicit in the record that says he is climbing up to the top bunk. That is justification to put the low bunk permit in place. And we have a physical therapist note in December of 2015, at the end of December of 2015, where plaintiff is reporting and saying that he's barely using the hand. So if he's trying to climb up to the top bunk in December, in January of 2015 into 16, you would expect that there would be some report in the record, either from a physical therapist who's not connected to this case, or a grievance. We've seen from the record that Mr. Thomas has the opportunity, knowledge, and ability to file grievances on a myriad of subjects when he believes they need to see fit. And what we do have here is inconsistent reporting by Mr. Thomas. We've got a two, almost a two-year period where his hand is fine, he's got no problems. He then files a report in October of 14 and into 15, but doesn't complain that he's got, he has any issues climbing the top bunk. There is no grievance after that period of time in January of 15, where he says, hey guys, I'm still not getting up, I still have to climb up to the top bunk, why aren't you giving me a little bumper? There's nothing in the record. And he's also seen by various providers during that period of time, in January of 15, into by the time that Dr. Obasi sees him in 16, and said, and doesn't complain of any hand pain where they asked to climb up to the top bunk. If this was a serious concern for Mr. Thomas, he would have alerted individuals at the facility through other means that he was having this pain, and he did not. And so, your honors, based upon the whole context of this case, Mr. Thomas had inconsistent complaints, and when his complaints were filed to providers, they addressed them. Mr. Thomas did not take the deposition of any of the treaters in this case, even though he had the opportunity to do so to explore what was happening. So what we've got is this record, and this record has indicated that Mr. Thomas is seen continuously again and again by medical providers who are providing treatment for his concerns. And as your honor has discussed before, that even developed into trying different medications for his prostate, and attempting through physical therapy, and through an outside orthopedic referral, which ended up just saying he needed a therapy, which he was already getting. And so, your honors, finally, with respect to the record, there was no policy in the evidence that would drive any sort of treatment decisions. The treatment decisions here were made by providers using their own clinical judgment. The policymaker argument was not promoted by Plaintiff on summary judgment grounds. Plaintiff is attempting to use our year-over-year estimates for any argument. It's not an amplification of a prior argument. And with respect to the pattern in practice, Judge Pallmeyer's decision, we believe, was correct, was a pattern of practice. Thank you. Thank you very much, Mr. Skarpiak. Anything further, Mr. Chung? You're down. I'll give you a full minute. Thank you, your honor. Opposing counsel is really asking this court to resolve disputed issues of fact, and he's drawing a very stringent and uncharitable inference from the record. And the test is whether a jury can draw a reasonable inference that he needed the lower bunk permit. And that standard is clearly met. He asked repeatedly for a low bunk permit in October 2014 and in January 2015, and he didn't receive one. And throughout this period of time, he continued to complain about pain in his hand. Mr. Tong, let's zero in on that last statement of yours. When you say that Mr. Thomas continued to complain of pain in his hand, what particular month or year are you referencing or record reference do you offer? Your honor, I would say from October onwards. October, we have a very clear statement that he January of January 2016 when he sees Dr. Martiha. I'm sorry, December of 2015 when he sees Dr. Martiha for renewal. Anything between January of 15 and December of 15 when he sees Dr. Martiha? Well, he gets the extension in June, right? So he's asking Dr. Obese again in June. Right. In June of 2015, that's when he gets the low bunk permit. So one can infer from the record that he asked for it again. And your statement was with regard to the pain, the continuous complaints of the pain. I'm asking that time from any record references or or statements to support your statement. Yes, your honor, I think those October 2014, January 2015, December 2015, June 2015. Those statements all show that he did ask for a low bunk permit because he was in pain. And generally, in sub appendix, if you look at his deposition, he says that he's spoken with Dr. Martiha on a consistent basis about his pain. Thank you, Mr. Tong. Thank you, your honor. Your time is up, Mr. Tong. Thank you very much. The court appreciates your taking the appointment in this case. It's of great assistance to us. Thank you, of course, as well to Mr. Skarpiak. We will take the case under.